UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2016 MAR 11  PM 4: 05

DEPUTY CLERK_____

| | |
|---|---|
| [UNDER SEAL] | CIVIL ACTION NO.: |
| Plaintiffs, | |
| v. | 3-16CV0707-D |
| [UNDER SEAL] | |
| Defendant. | SEALED |

## QUI TAM COMPLAINT

### FILED UNDER SEAL

**DO NOT FILE**

**WITH PACER**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. THOMAS PROSE, | CIVIL ACTION NO.: |
| Plaintiffs, | QUI TAM COMPLAINT |
| | JURY TRIAL DEMANDED |
| v. | |
| RELIANT REHABILITATION, | FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2) |
| Defendant. | |

3-16CV0707-D

I. INTRODUCTION

*Qui Tam* Relator Thomas Prose, M.D., through his counsel, Robins Kaplan LLP, and on behalf of the United States of America, brings this Complaint against Reliant Rehabilitation ("Reliant"), and alleges based upon his own direct and independent knowledge:

1. This is an action to recover damages and civil penalties on behalf of the United States of America, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used, or presented by Reliant and its agents, predecessors, successors, and employees in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-3733, as amended (the "FCA" or the "Act").

2. Reliant contracts with rehabilitation hospitals, acute care facilities, and skilled nursing facilities ("SNFs"), among other facilities, to provide rehabilitation services. Reliant employees or contractors provide various rehabilitation services at or on behalf of the facility and Reliant is compensated by the facility for those services. Many of those services are, in turn, billed to federal healthcare programs by the facility.

1

3. As a means of securing contracts for rehabilitation services, Reliant offers financial incentives that are prohibited by the Federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). These illegal kickbacks take at least two forms. *First*, Reliant provides nurse practitioner or physician's assistant services to the facility either at no charge or for a nominal fee that is substantially below fair-market value. These valuable services are offered on those terms only on the condition of the facility's commitment to refer its rehabilitation services to Reliant. Many of those services are then billed to federal healthcare programs.

4. *Second*, Reliant offers facility physicians the opportunity to participate in a sham program that is designed solely to disguise illegal cash payments. More specifically, physicians agree to "review" medical charts in exchange for monthly cash payments of around $1,000. That payment is inconsistent with the fair market value of the physicians' efforts. Indeed, upon information and belief, Reliant does not use the reviews and assigns no value to them. And often physicians receive payments without having completed the review. The physician payments are conditioned on – and intended to induce – referrals of the facility's rehabilitation services to Reliant. Many of those services are then billed to federal healthcare programs.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

6. This Court has personal jurisdiction and venue over Reliant pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because Reliant has minimum contacts with the United States. Moreover, Reliant transacts business in this District.

7. Venue is also proper in this District pursuant to 31 U.S.C. § 3731(a) because Reliant can be found in, and conducts business in, this District. At all times relevant to this

Complaint, Reliant has regularly conducted substantial business within this District, had employees based in Texas, and made significant sales within Texas – including with the conduct at issue in this Complaint.

## III. THE PARTIES

### A. Relator

8. Relator Dr. Thomas Prose is a resident of the state of Michigan and a citizen of the United States.

9. Prose is the founder and owner of General Medicine P.C. General Medicine is a collaborative practice of board-certified physicians and advanced nurse practitioners who specialize in the care of post-acute care patients in long-term care facilities. Among other things, General Medicine provides "post-hospitalist" medical services, SNF program services, facility medical director services, attending physician services, and advanced nurse practitioner services.

10. Prose earned his Medical Doctorate, his Master's in Public Health, and his Master's in Business Administration from the University of Michigan. He has more than 30 years of experience in internal medicine, geriatrics and health care administration. He founded General Medicine in 1983. Prior to that, Prose was a medical director at Cigna Insurance Company. He also served as a medical consultant and member of the board of directors to a number of organizations, federal and state agencies, insurance carriers and health care systems.

11. For the reasons set forth in this Complaint, Prose is an "original source," as that term is used in the FCA. *See* 31 U.S.C. § 3730(e)(4)(B).

### B. Reliant

12. Headquartered in Plano, Texas, and organized as a limited liability company under the laws of the State of Texas, Reliant is a provider of contract rehabilitation management services. According to its website, Reliant provides rehabilitation programs to over 400 "Acute

Care Hospitals, Skilled Nursing Facilities, Subacute Facilities, LTACHs (Long Term Acute Care Hospital), Rehab Hospitals, and CCRCs (Continuing Care Retirement Community) across the United States." *See http://www.reliant-rehab.com/about-us* (last visited on 3/10/16). Reliant typically is compensated for these services by its facility customer, which, in turn, is reimbursed for the same services from third-party payors, including federal healthcare programs.

## IV.   APPLICABLE LAW

### A.   Medicare and Medicaid

13.   Medicare and Medicaid were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

14.   Medicare is a federally funded and administered health insurance program that provides benefits to certain groups. The U.S. Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").

15.   The Medicare program is divided into four components: (1) Part A, the hospital insurance benefits program, 42 U.S.C. §§ 1395c, 1395d; (2) Part B, the supplemental medical insurance benefits program, which pays for a portion of certain medical and other services, 42 U.S.C. §§ 1395j, 1395k, 1395i; (3) Part C, the Medicare Advantage Program, which allows CMS to contract with public and private entities to provide Medicare Parts A and B benefits to certain beneficiaries, 42 U.S.C. § 1395w-21 *et seq.*; and (4) Part D, the voluntary prescription drug benefit program, 42 U.S.C. § 1395w-101 *et seq.*

16.   The Medicaid program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS

administers Medicaid at the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

**B.  Medicare Coverage of Skilled Nursing Facility Rehabilitation Therapy**

17. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

18. For Medicaid enrollees, skilled nursing and rehabilitation care is also a covered service.

19. Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c). Medicare Part B provides coverage for skilled therapy to beneficiaries who have either exhausted their Part A benefit or are not otherwise entitled to Part A coverage.

20. For SNF services to be reimbursable under Medicare at least the following conditions must be met: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient received care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

21. Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the SNF and re-certify the patient's continuing need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

22. To be considered "skilled," a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

23. Medicare Part A covers only those services that are "reasonable and necessary." *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary); 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health care).

24. In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quality. *See* Medicare Benefit Policy Manual, Ch. 8 § 30.

25. To assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in

order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395*l*(e).

26. SNFs may elect to contract with third party suppliers of rehabilitation therapy services, such as Reliant, to provide care to their residents. These contracts are referred to as "under arrangement" contracts.

27. When a SNF has entered into an "under arrangement" contract with a therapy services provider, such as Reliant, the supplier submits invoices to the SNF for the services it provides to residents, and the SNF, in turn, submits the claim for those services to Medicare or Medicaid. The therapy services supplier does not bill the payor directly.

28. Pursuant to the SNF Consolidated Billing requirements implemented as a part of the Prospective Payment System ("PPS"), the SNF is responsible for including on its submission almost all of the services that a resident receives during the course of his or her stay, even services billed "under arrangement."

29. For Part A beneficiaries, the SNF submits claims for therapy services as part of the Part A claims for the *per diem* assigned to that resident. As explained below, the Resource Utilization Group ("RUG") category for each Part A patient takes into account the facility's costs for services performed for Part A beneficiaries, including the rehabilitation therapy services performed "under arrangement."

30. For Part B beneficiaries, who are not eligible under Part A or who have exhausted their Part A benefit, the SNF submits claims for payment for the therapy services under the Medicare Fee Schedule ("MFS"). As explained further below, the MFS establishes a per-service payment for individual therapy services based on time-based codes appropriate to the service provided.

31. Because therapy services are subject to Consolidated Billing requirements regardless of whether beneficiaries are in a covered Part A stay, SNFs (and not the third party supplier) submit claims to federal healthcare programs for all therapy services provided to residents under Part A, Part B, and other government programs.

**B.  Medicare Payment for Skilled Nursing Facility Rehabilitation Therapy**

32. Under its PPS, Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

33. The daily PPS rate that Medicare pays a nursing facility depends, in part, on the RUG to which a patient is assigned. Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

34. There are generally five rehabilitation RUG levels for those beneficiaries that require rehabilitation therapy; Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

35. The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled therapy minutes a patient received and the number of therapy disciplines the patient received during a seven-day assessment period (known as the "look back period"). The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-III classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | Minimum 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week |
| RV = Very High | Minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RH = High | Minimum 350 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week |
| RM = Medium | Minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines |
| RL = Low | Minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines |

*See* 63 Fed. Reg. at 26,262.

36.  Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level. The Ultra High ("RU") RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

### C.  Statements and Claims to Medicare for Payment of Skilled Nursing Facility Rehabilitation Therapy

37.  Medicare requires providers of skilled nursing facility rehabilitation therapy to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments using a standardized tool known as the Minimum Data Set ("MDS"). The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay a nursing facility to provide skilled nursing therapy to that patient.

38.     In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. The date the facility performs the assessment is known as the assessment reference date. A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstance, up to five days after. When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period."

39.     The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section P of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period. In particular, Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline (*i.e.*, physical therapy, occupational therapy, and speech-language pathology and audiology services). As discussed below, the information contained in Section P directly impacts the rehabilitation RUG level to which a patient will be assigned.

40.     In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. *See* 63 Fed. Reg. at 26,267.[1] For example, if a patient is assessed in day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

---

[1] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

10

41. The nursing facilities electronically transmit the MDS form directly to CMS. 42 C.F.R. § 483.20(f)(3).

42. Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265. The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." Minimum Data Set (MDS) – Version 2.0 for Nursing Home Resident Assessment and Care Screening.

43. A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included in the CMS-1450, which nursing facilities submit electronically to Medicare for payment. *See* Medicare Claims Processing Manual, Ch. 25, § 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

44. Skilled nursing facilities submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors, known as Medicare Administrative Contractors, formerly known as Fiscal Intermediaries.

**D.   Anti-Kickback Statute**

45. The AKS, 42 U.S.C. § 1320a-7b(b), is a criminal statute that prohibits anyone from knowingly or willfully paying or receiving remuneration in exchange for referrals or the purchase of any item or service that may be paid for by a federal healthcare program. The statute arose out of congressional concern that payments or things of value provided to those who can

11

influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to patients. "Remuneration" under the AKS has been broadly interpreted by courts to include anything of value – including office services provided at less than fair market value.

46. After amendments enacted pursuant to the Affordable Care Act, the AKS now specifically provides that a violation of the statute constitutes a false or fraudulent claim under the FCA. 42 U.S.C. § 1320(g).

47. The Office of the Inspector General of HHS ("OIG") has specifically warned that, "[w]hile the mere placement of an . . . employee in [a customer's] office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the [employee] performs additional tasks that are normally the responsibility of the [customer's] office staff." OIG Special Fraud Alert, 59 Fed. Reg. 65,372, 65,377 (Dec. 19, 1994); *see also* OIG Advisory Opinion 98-16 (Nov. 3, 1998) (cautioning that, where a health care vendor assigns an employee to work in a customer's office and the employee provides services that the customer otherwise would have to provide at its own expense, "an inference arises that one purpose of [such an] arrangement is to induce or reward referrals"), available at http://oig.hhs.gov/fraud/docs/advisoryopinions/1998/ao98_16.htm (last visited on 3/10/16).

V. **RELIANT'S AKS VIOLATIONS**

   A. **Reliant Provides Services for Free or at Below Fair Market Value to Induce Referrals**

48. With the intent of inducing SNFs and hospitals to hire Reliant to perform rehabilitation services, Reliant offered facilities valuable nurse practitioner and physician's assistant services either at no charge or at rates well below fair market value. These efforts

resulted in millions of dollars of rehabilitation claims being submitted to and paid by federal healthcare programs.

49. On February 10, 2014, a member of General Medicine's management team attended a demonstration of Reliant's "Medical Management" program. At the demonstration, which took place at Meadowview HCC, a SNF located in Harrisonville, Missouri, Reliant executives explained the program. These included Libby Pinnell, Reliant's Vice President of Business Development, as well as the company's Vice President of Rehab services, and its Director of Clinical Services.

50. At that meeting, Reliant's executives explained that, under its Medical Management program, the company offers nurse practitioner services and physician's assistant services to facilities that contracted with Reliant to perform rehabilitation services. The practitioners that Reliant would provide to the facilities were employed by Reliant. But, on the condition that the facility use Reliant to perform rehabilitation services for the facility's patients, Reliant would make them available to the facility either at no charge, or at a contracted rate that was well below fair market value for the services rendered. The executives characterized the offering as a "Value Added Service," claiming that it would ensure the ongoing success of the company's "healthcare partners."

51. The cost of providing these nurse practitioner and physician's assistant services was significant to Reliant. The nurse practitioners and physician's assistants would staff the facility five days a week and remain on call to the facility's physicians 24/7. One executive estimated to Prose that the company lost around $2 million annually per community from giving the services away. But, as Reliant knew and intended, the Medical Management program was a remarkable profit generator because of the rehabilitation services contracts it generated for the

company. Indeed, one Reliant executive estimated that the program led to at least an additional $8 million in rehabilitation services revenue per community.

52. At the meeting, the Reliant executives described several examples where this program had proved successful. The examples included SNFs in Texas, where the program originated, as well as Louisiana. All told, the executives stated that the company had implemented this program in hundreds of facilities around the country.

**B. Reliant Offers Cash Payments to Doctors Pursuant to Sham Services Agreements**

53. To further improperly encourage facilities to contract with Reliant, the company also entered into sham services agreements with the facilities' physicians.

54. As part of the Medical Management program, physicians were given the opportunity to earn extra money for minimal work. As the executives explained at the February 2014 meeting, if a facility's physician agreed to "collaborate" with the nurse practitioners and physician's assistants that Reliant provided, the physician would receive a monthly "stipend" of between $500 and $1,000. Of course, this "stipend" was conditioned on the facility's contracting with Reliant to perform rehabilitation services.

55. In theory, the physician would be responsible for a cursory review of charts the Reliant practitioners kept as part of the "collaboration." But, upon information and belief, that exercise was a mere cover for the real purpose of the payments Reliant made to the doctors – to induce them to refer lucrative rehabilitation services to Reliant. And, as the executives made clear at the February 2014 meeting, the plan worked. Hundreds of facilities hired Reliant to perform millions of dollars of rehabilitation services for their patients – with many of those services in turn being billed to and paid for by federal healthcare programs.

56. Reliant's executives confirmed at the February 2014 meeting that the company's illegal kickbacks took other forms as well and included other "value add services" such as

paying 100% of joint marketing to local physicians and hospitals. Reliant pitched these offerings as having significant value to the prospective customers in their attempt to attract patients.

## COUNT I
### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

57. Prose repeats and realleges paragraphs 1-56, as if fully set forth herein.

58. Reliant knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare and Medicaid for rehabilitation therapy.

59. Reliant offered remuneration to providers to induce referrals for services paid for by federal healthcare programs. As a direct and foreseeable consequence of Reliant's illegal conduct, millions of dollars of claims were submitted by providers to Medicare and Medicaid for rehabilitation therapy services. Because those claims violated the AKS, they constitute violations of the FCA as well.

60. Because of Reliant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of $11,000 for each violation.

## COUNT II
### Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

61. Prose repeats and realleges paragraphs 1-60, as if fully set forth herein.

62. Reliant knowingly made or caused to be made false records and statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

63. Specifically, Reliant offered remuneration to providers to induce referrals for services paid for by federal healthcare programs. As a direct and foreseeable consequence of Reliant's illegal conduct, millions of dollars of claims were submitted by providers to Medicare and Medicaid for rehabilitation therapy services. Because those claims violated the AKS, they constitute violations of the FCA as well.

64. Because of Reliant's acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Relator requests the following relief:

1. Judgment against Reliant for three times the amount of damages the United States has sustained because of Reliant's actions, plus a civil penalty of $11,000 for each violation of the False Claims Act, 31 U.S.C. §§ 3729-3733.

2. 25% of the proceeds of the action or settlement of the claim if the Government proceeds with the action, and 30% of the proceeds of the action or settlement if the Government does not proceed with the action. *See* 31 U.S.C. § 3730(d)(1)-(2).

3. Reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. *See* 31 U.S.C. § 3730(d)(1)-(2).

4. Such other relief as the Court deems just and appropriate.

### Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: March 11, 2016

By: _/s/ Steven Callahan_
Steven Callahan
Texas State Bar No. 24053122
scallahan@ccrglaw.com
Anthony M. Garza
Texas State Bar No. 24050644
agarza@ccrglaw.com
**Charhon Callahan**
**Robson & Garza, PLLC**
3333 Lee Parkway, Suite 460
Dallas, Texas 75219
Telephone: 214-521-6400
Telecopier: 214-764-8392

Jeffrey S. Gleason (to move for *pro hac vice* admission)
Jamie R. Kurtz (to move for *pro hac vice* admission)
**Robins Kaplan LLP**
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Telephone: 612-349-8500
Telecopier: 612-339-8562

*Attorneys for Relator Dr. Thomas Prose*

17

3-16CV0707-D

JS 44-TXND (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America, Ex Rel. Thomas Prose

**DEFENDANTS**
Reliant Rehabilitation

**(b)** County of Residence of First Listed Plaintiff: Wayne County, Michigan
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Collin County, Texas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Steven Callahan, Anthony Garza
Charhon Callahan Robson & Garza, PLLC
3333 Lee Parkway, Suite 460, Dallas, TX 75219, 214-521-6400

Attorneys *(If Known)*

SEALED

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 340 Marine | | | | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729(a)(1)(A) and 31 U.S.C. 3729(a)(1)(B)
Brief description of cause:
Violation of the false claims act and violation of the federal anti-kickback statute

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ Unknown at this time
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED PENDING OR CLOSED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 3/11/2016
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # ___ AMOUNT ___ APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___